

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 23, 2024

**BY ECF**

Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:   *United States v. Nishad Singh*, 22 Cr. 673 (LAK)

Dear Judge Kaplan:

The Government writes in advance of defendant Nishad Singh's sentencing scheduled for October 23, 2024, at 3:00 p.m., to advise the Court of his exemplary cooperation that was important to the Government's successful prosecutions of Samuel Bankman-Fried and Ryan Salame, and the recovery of assets stolen during one of the largest financial frauds in history. This submission describes Singh's substantial assistance in the investigation of wrongdoing at FTX, the prosecution and trial of Bankman-Fried, and the prosecution of Salame.

As detailed below, Singh's testimony was a core part of the Government's proof at the trial against Bankman-Fried. In particular, Singh provided important testimony about Bankman-Fried's mental state in September through November 2022, recounting for the jury in vivid detail his conversations with Bankman-Fried about the theft and use of FTX customers' funds. He aided the Government in understanding how FTX's code permitted the illegal use of customers' funds, and he identified in detail the transactions by Bankman-Fried that involved the use of stolen money. Singh also brought to the Government's attention criminal conduct that the Government was not aware of and, in some cases, may have never discovered but for Singh's cooperation. That included information about Bankman-Fried and Salame engaging in one of the largest-ever campaign finance schemes, and instances when Bankman-Fried manipulated FTX's financials to make its revenue appear greater. Singh approached his cooperation with earnest remorse and eagerness to assist. He began meeting with the Government shortly after FTX's collapse, produced Signal messages to the Government that would otherwise have been unavailable, and spent considerable time reviewing documents and FTX's code to help identify key pieces of evidence that were used at trial.

In light of these facts, and assuming that Singh continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1

of the U.S. Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), that the Court sentence Singh in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

**I.     Background and Offense Conduct**

Singh grew up in the Bay Area and attended high school with Samuel Bankman-Fried's younger brother. In college, Singh became interested in effective altruism. After college, he was hired by Facebook and committed to donating some of his income to charities. During this period he was reconnected with Bankman-Fried, whom he had met in high school, and who had also expressed an interest in effective altruism. In 2017, Bankman-Fried invited Singh to visit Alameda Research, which Bankman-Fried had founded in northern California. Singh admired Bankman-Fried's success and was drawn to Alameda Research because its employees had pledged to donate 50% of the firm's profits to charity. At the time, Singh was an inexperienced software engineer, having just graduated college. He started at Alameda Research on a trial basis, and was later offered a full-time job. While at Alameda, Singh was focused on automating Alameda's trading. Throughout his time at Alameda Research, Singh never directed the firm's trading; he did not control the firm's funds; he was not involved in the firm's borrowing of money from lenders; and he was not in an executive-level leadership position.

In 2018, Bankman-Fried relocated to Hong Kong to start FTX. By April 2019, Singh was spending most of his time working on the exchange. Singh ultimately relocated to Hong Kong in February 2020. Singh eventually became an engineering manager at FTX and then FTX's Head of Engineering. At FTX, Singh was focused on FTX coding and tech support alongside Gary Wang. Over time, Singh divided his time between coding and managing other engineers. By the time of FTX's collapse, Singh had a team of approximately 20 engineers.

*A. Fraud on FTX Customers*

The evidence at Bankman-Fried's trial proved that over the course of multiple years, Bankman-Fried stole and directed the misappropriation of billions of dollars in customers' funds. The fraud is one of the largest financial frauds ever, resulting in billions of dollars in losses and thousands of affected victims. While not the mastermind, Singh, like Bankman-Fried's other co-conspirators, contributed to the fraud on FTX customers. As Singh described during his guilty plea and at Bankman-Fried's trial, he came to understand how customer funds had been used by Bankman-Fried long after Singh had assisted in putting in place the computer code that allowed Bankman-Fried to steal the money. Nonetheless, this was an incredibly serious crime, for which Singh has accepted responsibility and expressed remorse.

Singh's involvement began, unwittingly, early in his time at FTX. Bankman-Fried asked Wang and Singh to implement features in FTX's code that gave Alameda Research various forms of preferential treatment. Wang and Singh—at Bankman-Fried's direction—added an "allow negative balance" feature to FTX's code, which later permitted Alameda Research to have a negative balance on FTX. When Singh implemented the initial version of "allow negative" in July 2019 (when he was still in California and Bankman-Fried was in Hong Kong), he understood the feature was to be used to facilitate the transfer of locked FTT. (Trial Tr. at 1365). In fact, as he would later learn, Bankman-Fried used the "allow negative" feature to withdraw billions of dollars

in customer money from the FTX exchange. Wang also later added features—that Singh learned about over time— permitting Alameda Research to withdraw money from the exchange, even if it did not have sufficient funds, and to be exempt from the exchange's automatic liquidation feature.

Singh also knew that some FTX customer fiat deposits were processed through Alameda Research's bank accounts, and were tracked in FTX's database under fiat@ftx.com. (Trial Tr. at 1351). For years he believed that Alameda Research was accounting for these deposits properly. For instance, in late 2021, after an accounting "bug" was discovered, Singh asked Caroline Ellison about whether Alameda Research was still using the fiat@ftx.com account to track deposits, and she confirmed that it was. (Trial Tr. at 1517).

In May 2022, the cryptocurrency stablecoin Terra and its sister token, Luna, collapsed in value, triggering a collapse of several other cryptocurrency businesses such as the firm Three Arrows and the lenders Celsius and Voyager. Unbeknownst to Singh—who was not involved in Alameda Research's borrowing—the instability in the cryptocurrency market caused Alameda Research's lenders to recall nearly all of their loans.

In June 2022, Bankman-Fried asked Ellison, Wang, and Singh to work to calculate Alameda Research's balances on FTX.com. While Singh was not involved in accounting for FTX and Alameda Research, and the request did not "fit into [his] overall responsibilities at FTX," Singh agreed to help. Singh recalls that he asked Wang what he could do to assist, and Wang asked him to identify any accounts on FTX that belonged to Alameda Research. (Trial Tr. at 1348). Wang re-did Singh's work, and the resulting spreadsheet showed Alameda Research had incurred a negative $2.7 billion balance in its main account on FTX.com. That fact "seriously concerned" Singh because it "seemed like a real abuse of a feature that until this point [he] believed was serving FTX, not hurting it." (Trial Tr. at 1366). As Singh explained when he pled guilty, by mid-2022, he "understood that Alameda was borrowing funds from FTX that belonged to other customers," that "customers were not aware of this, and had not consented to such borrowing." (Guilty Plea Tr. at 28). Nonetheless, because the overall balance across all the accounts on the spreadsheet showed that "Alameda had positive balances on FTX," Singh did not appreciate the true implication of Alameda Research's large negative balance in its main account. (Trial Tr. 1404). Additionally, while the spreadsheet showed a large negative balance in the fiat@ftx.com account, at that point Singh believed "Alameda had $11 billion in its bank account" corresponding to the fiat deposit number on FTX. (Trial Tr. at 1359-60). He was unaware that Bankman-Fried had authorized that money to be spent. After calculating Alameda Research's balances, Bankman-Fried instructed Ellison to "go ahead and return the borrows" to "lenders who loaned Alameda money and were asking for it back." (Tr. 440-41). But Singh was not involved in that decision and did not know that Bankman-Fried repaid Alameda Research's lenders at that time.

Everything clicked for Singh in September 2022. On September 7, 2022, Bankman-Fried authored and circulated a Google Doc titled "*We came, we saw, we researched*," in which he proposed shutting down Alameda Research. After Bankman-Fried circulated this proposal, he discussed it with Ellison, Wang, and Singh. In response, Singh proposed that rather than shutting down Alameda Research, they simply close out its accounts on FTX. Ellison told Singh that that was "impossible." (Trial Tr. 1403). "At this point [Wang] said Alameda is borrowing 13 billion from FTX." (*Id.*). Singh testified that he was "afraid" after hearing this, and then asked for a

meeting with Bankman-Fried, Wang, and Ellison. (Trial Tr. at 1403-04). Singh testified that when they met, Bankman-Fried "seemed unsurprised" by this information and made up what Singh "understood to be a false excuse for dodging [the] meeting." (Trial Tr. 1404-05). Singh met with Wang and Ellison, and, as he testified, then understood that Alameda Research had been using billions of dollars of FTX customer funds. (Trial Tr. at 1405). Worse yet, it became clear to Singh then that Alameda Research was not going to be able to repay the funds it had taken. (*Id.*).

That evening, Singh asked for a one-on-one meeting with Bankman-Fried on the balcony of the penthouse apartment in which Singh and Bankman-Fried lived. (Trial Tr. at 1405). Singh testified in detail about this meeting at trial. According to Singh, he began the conversation with Bankman-Fried by telling him that he and Ellison were "freaked out" about Alameda Research's net asset value. (Trial Tr. at 1406). After Bankman-Fried deflected, Singh raised the issue more directly, pointing out that "there's 13 billion borrowed and we can't pay it all." (Trial Tr. at 1407). Finally engaging Singh, Bankman-Fried remarked, "Right, that. We are a little short on deliverable." (*Id.*). Bankman-Fried conceded that "this has been taxing me some 5 to 10 percent of my productivity," to which Singh countered, "this is going to be doing a lot more damage to me, hitting me a lot harder." (*Id.*). Bankman-Fried expressed regret that he had shared the information with Singh. (*Id.*). During their meeting, Singh urged Bankman-Fried to reign in his spending—a request of Bankman-Fried that proved futile. (Trial Tr. at 1408-09).

After this realization, Singh considered quitting his job at FTX. He did not, however, leave the company. At trial, he explained that he decided not to quit because he believed it would contribute to the collapse of FTX. (Trial Tr. at 1409). Bankman-Fried had told Singh that their way out of the problem was to keep "making FTX successful and growing it," and so Singh remained. (Trial Tr. at 1412). In his final months at FTX, despite knowing of the massive "hole" at FTX, Singh spent and/or approved spending millions in what were customers' funds. Most of that spending was for corporate purposes: Singh approved transactions as one of FTX's executives, he participated in a large capital expenditure by FTX, and he made political contributions with funds from FTX and Alameda Research (described below). (Guilty Plea Tr. at 28). Singh also completed the purchase of a home in the San Juan Islands for approximately $3.7 million, despite knowing that the money being withdrawn from FTX was necessarily customers' money. (Trial Tr. at 1604).

At the same time, Singh also pushed Bankman-Fried to curtail his spending. He repeatedly told Bankman-Fried to cut down on endorsement deals, to stop acquisitions (such as for Embed and AZA), and to cancel plans for a new FTX office. (Trial Tr. at 1408-18). In total, Singh estimated at trial that he successfully convinced Bankman-Fried to cut "a couple hundred million dollars" in spending. (Trial Tr. at 1413-14). But at the same time, Bankman-Fried and FTX continued to engage in rampant spending. During this period, Singh learned about, and then confronted Bankman-Fried about, a series of large endorsement deals that Bankman-Fried had agreed to. (Trial Tr. at 1415). Bankman-Fried challenged Singh to identify a bad investment, and Singh identified several transactions he believed were "cuttable" or should be "strongly curtailed." (Trial Tr. at 1414). But Bankman-Fried refused to change his spending. (*Id.*).

In October 2022, Bankman-Fried and another FTX employee went to the Middle East to meet with potential investors. While there, Bankman-Fried pitched to several FTX employees,

Case 1:22-cr-00673-LAK    Document 526    Filed 10/23/24    Page 5 of 17

Page 5

over Signal, the idea of purchasing Telegram for hundreds of millions of dollars. (Trial Tr. at 1416). Singh raised a number of objections to the deal, but was not "transparent about [his] worry that this was digging into customer funds." (Trial Tr. at 1417). Bankman-Fried responded that they were "going ahead" with the deal and unless they had "any serious new objections" it would happen. (*Id.*).

A month later, a series of events spurred FTX's collapse. On November 2, 2022, CoinDesk published an article disclosing a version of Alameda Research's balance sheet. That news, followed by a tweet by the founder of Binance about selling FTT, caused panic amongst FTX users, prompting them to withdraw funds from the exchange. Around November 5, concerned about a "bank run," Singh began tracking the withdrawals around this time and observed that the rate of net withdrawals was speeding up. (Trial Tr. at 1457). At the time, he was "very concerned that this might spell doom," ending what had been a futile effort "to make customers whole" and the "ongoing fraud" in the process. (*Id.*). Bankman-Fried was focused on convincing customers not to withdraw their money, and on the evening of November 6, he was workshopping potential tweets to curb the withdrawals. (Trial Tr. at 1464). Bankman-Fried suggested several tweets characterizing FTX as "solvent" or "well capitalized." (*Id.*). Singh was "very uncomfortable with both definitions" and believed "neither was true." (*Id.*). He told Bankman-Fried that he was "not comfortable with this" and was "recusing" himself. (*Id.*). The next morning, without Singh's involvement, Bankman-Fried tweeted, among other things, that "assets are fine"—a tweet that Singh testified was false. (Trial Tr. at 1465-66).

Singh was concerned not just about FTX's collapse, but what would come of all of the loans in his name. For years, at Bankman-Fried's request, Singh had been asked to take loans from FTX for corporate purposes, described below, including financing acquisitions and capitalizing FTX.us. (Trial Tr. at 1459). As FTX's collapse was becoming a growing likelihood, Singh became "terrified" that he would not "be able to repay all [his] loans," and that they would "look really corrupt." (Trial Tr. at 1458, 1461). Singh asked Bankman-Fried over Signal about whether Bankman-Fried would be authorize a backdated transaction to relieve himself of loan obligations. (Trial Tr. at 1461). Bankman-Fried agreed to let Singh do it, although the transaction never ended up taking place. (Trial Tr. at 1461).

By November 8, Singh was not in "a right mind" and had been "suicidal for some days." (Trial Tr. at 1461, 1473). As Can Sun described Singh in those final days, "it looked like his soul had been plucked away from him." (Trial Tr. at 1958). Bankman-Fried told Singh that he was infecting the atmosphere and making it unproductive, while they were trying to raise equity investments. Singh then resigned to Bankman-Fried by email and left the Bahamas on November 10.

### B. Fraud on FTX Investors and Auditors

In addition to accepting responsibility for his involvement in FTX's fraud on its customers, Singh also took responsibility for actions he had taken previously to make FTX's revenues appear higher than what they were. Those inflated figures were shared with investors.

Singh understood that Bankman-Fried was attempting to raise money from investors, and in connection with those efforts, Bankman-Fried was providing investors with FTX's financial statements. Bankman-Fried was intent on being able to say that FTX revenue for 2021 was over $1 billion, but the revenue for the year was coming up short by approximately $50 million. (Trial Tr. at 1446). Bankman-Fried directed Singh to manufacture a series of backdated transactions related to the staking of Serum on FTX that amounted to $50 million, which then enabled Bankman-Fried to claim that FTX revenue for 2021 was over $1 billion. (*Id.*). Singh charged the "EcoSerum Foundation" (which Singh understood to effectively be controlled by Bankman-Fried) a 25% fee on staked rewards on FTX, which backed in to a $50 million receivable from EcoSerum to FTX. (Trial Tr. at 1447). Singh executed a number of payments from EcoSerum to FTX and backdated the transfers to make them appear as though they had been happening over time. (Trial Tr. at 1448-50). When Singh reviewed this information with auditors, he presented these payments as legitimate third-party transactions that took place periodically throughout, when in reality these were backdated transactions that involved Bankman-Fried transferring Serum funds that he controlled over to FTX to create the appearance of higher revenue. (Trial Tr. at 1452-53). Bankman-Fried later created a backdated document—which Singh was unaware of—to paper the backdated transaction. (Trial Tr. at 1453-54). As discussed below, Singh brought this information to the Government's attention when he first began proffering.

Singh was also involved in a transaction, at Bankman-Fried's direction, to shift losses incurred by FTX to Alameda Research, thereby removing them from FTX's books and records. In 2021, an FTX user exploited a problem in FTX's margin system and caused FTX to overvalue a cryptocurrency called MobileCoin, causing losses to FTX. (Trial Tr. at 1456). Bankman-Fried directed that the losses be booked to Alameda Research, not FTX, so that the "losses would not be publicly shared" with investors. (*Id.*).

While not a subject of his trial testimony or his guilty plea, Singh volunteered to the Government two other instances where he acted deceptively toward FTX's auditors. In both instances, the Government was unaware of this conduct prior to Singh proffering about it, and it appears the conduct did not have a material effect on FTX's audited financials. First, during FTX's audit in 2021 (for the years 2019/2020), and again during the 2022 audit (for 2021), the auditors asked Singh for a breakdown for how much stablecoin belonged to customers and how much belonged to FTX. Singh brought the issue to Bankman-Fried and Wang, who tried unsuccessfully to write code to compute customer balances. Singh instead showed them a nonfunctional piece of code, misrepresenting to the auditors that the code had generated the stablecoin balances, when it had in fact come from a computation. The derivation was therefore fabricated, although Singh maintains that he believes the number was correct (and the Government has no reason to believe otherwise). Second, Singh told the auditors that there was a multi-signatory process for FTX's cold wallets, when that was not the case.

Finally, as Singh stated at his guilty plea, after learning about Bankman-Fried's use of customer funds in September 2022, Singh "understood … implicitly that [Bankman-Fried] would not share FTX's full financial condition" with prospective investors. (Guilty Plea Tr. at 30).

### C. Campaign Finance Violations and Money Laundering

Prior to joining Alameda Research and FTX, Singh had been passionate about effective altruism and donating a large portion of his earnings to charity. In 2020, Sam Bankman-Fried emailed Singh and told him that he was going to start making political donations, largely advised by his mother Barbara Fried, and offered that she could also advise Singh if he was interested in donating. Singh made a $1 million contribution to a political action committee advised by Bankman-Fried's mother, as well as several other PACs recommended by her. While those early contributions were targeted towards organizations that Singh believed were consistent with his values, near the end of 2021, Bankman-Fried and his brother asked Singh to start making more contributions to help their efforts in the 2022 midterm elections.

Over the course of 2022, Singh was enlisted in an effort to make large, coordinated donations to candidates favored by Bankman-Fried and his advisors. As conceived of by Bankman-Fried, Salame made donations to Republican candidates, Singh made donations to largely progressive Democratic candidates, and Bankman-Fried hewed closer to the center left. The donations were part of a collective effort to advance Bankman-Fried's political objectives and FTX's business purposes, as well as effective altruism. As one of Bankman-Fried's advisers described it to Singh over Signal, "in general, you being the center left face of our spending will mean you giving to a lot of woke shit for transactional purposes." (GX-477). As part of that effort, some donations were made directly to individual politicians and some were made to PACs. Over time, Singh made contributions at the direction of others without much input into the ultimate recipients—at times, he even donated to candidates whom he otherwise would not personally support financially. As Singh told one of Bankman-Fried's political advisers over Signal while pushing back against a contribution he had been asked to make, "I don't love boxing myself into only associating with people I don't like." (GX-477).

Because of the amount of donations being made in Singh's name, Bankman-Fried directed Salame to fund Singh's bank accounts and make the donations. For some of the contributions, particularly many of the donations toward the end of 2022, Bankman-Fried or one of his advisers identified who Singh would contribute to and the amount of the contribution; Salame then transferred funds to Singh's account from Alameda Research so as to fund the contribution; Salame then queued up a donation from Singh's account; Singh approved the bank transfer (as was necessary for the bank to process it); and then the funds went out. Someone else—not Singh— filled out the donation forms for Singh's contributions. Some of Singh's contributions were funded using money transferred from Alameda Research's funds, which Singh understood as loans he was required to pay back. Other donations were paid for through margin borrowing on FTX, followed by withdrawals, that Singh did through his FTX account. While Singh had sufficient funds in his account to cover the withdrawals, because they were borrowing on his personal line of credit at FTX, by September 2022 he knew those withdrawals were effectively drawing on FTX customer funds.

Many of the requests for Singh to contribute came over Signal, in chats with Bankman-Fried, Singh, and Bankman-Fried's other political advisers. In one chat, which was produced to the Government by Singh, called "Donation Processing," contributions were proposed and coordinated amongst a group. Salame often messaged the group, tagging Singh, saying that he had

prepared the donations and that Singh just needed to approve. In one chat, for example, Salame wrote, "SBFs are all queued and sent. @Nishad Singh you got about 30 small dollar ones rolling in if you can confirm in your email." In another Signal chat, also produced by Singh, one of Bankman-Fried's advisers proposed making many contributions in Singh's name through an online payment processor, and when they ran into technical problems, Singh was asked to sign dozens of checks that were used to make donations.

The transfers to Singh, Salame, and Bankman-Fried for purposes of making political donations were often recorded in Alameda Research's general ledger as "expenses" or "loans." There was no documentation establishing the existence of a real loan for any of these transfers. Singh believed that he owed money back to Alameda Research—and that belief is corroborated by documentary evidence—but Bankman-Fried and Salame did not share that belief or express that the money would be repaid.

While Singh contributed a large amount of money to candidates and PACs in 2022, his involvement in those contributions was comparatively minor. He was, in every sense, a straw donor. Singh understood that the donations were "for the benefit of" Bankman-Fried and his quest to be "politically influential," and he "understood that any reporting of the donations would conceal that the money came from Alameda [Research]." (Guilty Plea Tr. at 33). At the time Singh made contributions in the fall of 2022, he understood that the "money had to be coming, effectively, from FTX customer funds." (*Id.*). The Government debriefed Singh extensively about his understanding (or lack of understanding) about the campaign finance laws, and as Singh described at his guilty plea, unlike Bankman-Fried and Singh, he "wasn't familiar with the campaign finance rules." (*Id.*). Nonetheless, while he was "not sure whether [his] conduct was unlawful," he knew it was "wrong," and he "chose not to ask questions." (*Id.*).

Singh's involvement in these illegal contributions provided the factual basis for his guilty plea to conspiracy to commit campaign finance violations and money laundering. It also provided the basis for charging Bankman-Fried with conspiracy to commit campaign finance violations, and a basis for charging him with conspiracy to commit money laundering. While the Bahamas did not grant the United States permission to try Bankman-Fried for conspiracy to commit campaign finance violations after he was extradited, the Government proved this conduct at his trial and relied on it at Bankman-Fried's sentencing.

### D. Loans and Singh's Spending in the Fall of 2022

In proffers with the Government, and to a limited extent during his trial testimony, Singh described his involvement in the following transactions: (i) large loans that were made from Alameda Research to Singh; (ii) a $10 million loan to Singh in April 2021; and (iii) spending by Singh in the fall of 2022. Information on each of those transactions is set forth below.

First, Singh received over $500 million in "loans" from Alameda Research. None of those loans flowed to Singh personally and he was not charged with any crimes relating to them. Rather, as was the case with loans made to Wang, these loans were directed by Bankman-Fried in order to effect transactions that benefited FTX enterprise. FTX.us needed money to make acquisitions but did not have the money. Bankman-Fried proposed to Singh and Wang that Alameda would loan

them money and they would invest that money in FTX, which would spend the money on acquisitions. Singh had to sign documents accepting the loans but the decision had been made and it felt like a foregone conclusion. Between approximately May 2021 and September 2022, there were loans of approximately $100 million from Alameda that went through Singh that were used to help capitalize FTX US and to pay for the buyout of Binance. Singh accepted these loans because Bankman-Fried told them they were necessary, and attorneys were involved in papering the transactions. With one exception—an investment relating to Embed—Singh did not know about the "hole" at FTX when he agreed to the "loans." The venture investment in Embed occurred in the fall of 2022 and was something that Singh objected to, but ultimately signed off on after being pressured by Bankman-Fried.

In 2021, Singh sought to exercise his equity options in FTX for the purpose of either donating the options or selling then and donating the proceeds. (Trial Tr. at 1514). To fund that equity purchase, Singh planned to sell his FTT and other crypto holdings. But Bankman-Fried asked Singh to, instead, take on a $477 million loan from Alameda Research to fund the acquisition of the FTX shares he was entitled to at a strike price four times higher than what he was entitled to. Bankman-Fried benefited by structuring the transaction in this way: it prevented the sale of FTT, it valued FTX's shares at a higher amount, and it benefited FTX from a tax perspective. No money was ever received by Singh. Like the prior loans, nothing about this structure benefited Singh.

Second, in April 2021, long before knowing of Bankman-Fried's misuse of FTX's customer's funds, Singh wanted to sell a portion of his FTT holdings to pay some expenses and provide financial assistance to family members. Bankman-Fried was hostile to that idea because he did not want Singh or other employees to sell FTT. Bankman-Fried told Singh that instead of selling FTT, he should take a loan. Singh took a loan of $10 million, transferred from Alameda Research, and used it to pay taxes, provide financial assistance to family, and make a charitable contribution. Singh was not charged with any crime relating to this withdrawal. Nonetheless, as his submission notes, he has been exploring whether there are funds that he could recover and return to the bankruptcy estate.

Third, after Singh's conversations with Bankman-Fried in early September 2022, he understood that any spending coming from Alameda Research was likely at the expense of FTX's customers. Nonetheless, in addition to making political expenditures, Singh spent approximately $3.7 million on the purchase of a home in the San Juan Islands. (Trial Tr. at 1604). Singh had been working to buy the home prior to learning about the "hole" at FTX, but he went through with the transaction. He has since expressed significant remorse for doing so, and forfeited the home without ever having lived there. (Trial Tr. at 1619).

II.     **Procedural History**

On November 10, 2022, Singh left the Bahamas and traveled to the United States. On November 14, 2022—three days after FTX's bankruptcy declaration—Singh had his counsel reach out to the Government. One week later, on November 21, 2022, Singh met with the Government and began proffering. He was the fourth FTX or Alameda Research employee the Government met with, following Wang and two lower level employees. A day before his first meeting with the

Government, Singh produced screenshots he had taken of Signal communications with Bankman-Fried, Wang, and Ellison, as well as a copy of the "*We came, we saw, we researched*" Google Doc that became an important trial exhibit. Singh made another production on November 22, 2022, which was the day after his first proffer. The Government did not have any of these materials before Singh produced them.

During his second proffer, on November 22, Singh described for the Government significant criminal activity involving Bankman-Fried that the Government was not previously aware of. That included the political contribution scheme and misleading conduct towards FTX's auditors. Singh subsequently provided documents relating to the campaign finance violations which, together with his information, formed the primary basis for the campaign finance charges against Bankman-Fried.

On December 9, 2022, a grand jury sitting in the Southern District of New York returned an eight-count Indictment charging Bankman-Fried with conspiracy to commit wire fraud, wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States and commit campaign finance violations. The charges against Bankman-Fried were unsealed on December 13, 2022, the same day the SEC and CFTC announced the initiation of civil proceedings against Bankman-Fried, and after Bankman-Fried was arrested in the Bahamas on a federal arrest warrant.

On February 28, 2023, Singh pleaded guilty before the Court pursuant to a cooperation agreement with the Government. Singh pleaded guilty to a Superseding Information that charged him in six counts with: (1) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; (2) wire fraud on customers, in violation of 18 U.S.C. § 1343; (3) conspiracy to commit commodities fraud, in violation of 18 U.S.C. § 371; (4) conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371; (5) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and (6) conspiracy to commit campaign finance offenses, in violation of 18 U.S.C. § 371. Singh was uninvolved in the wire fraud on Alameda Research's lenders and as a result he did not plead guilty to wire fraud on lenders.

Subsequent to his guilty plea, Singh met with the Government at least 20 times, and spent additional time outside of these meetings reviewing computer code, documents, emails, Signal messages, and spreadsheets in order to identify and decode relevant documents for the Government.

Singh testified at Bankman-Fried's trial in October 2023 for approximately two days. At the conclusion of the trial, Bankman-Fried was convicted on all seven counts of the superseding indictment. Bankman-Fried was not tried on the campaign finance offenses with which he was charged because the Bahamas did not consent to him being tried on those charges. Nonetheless, Singh testified about that conduct at Bankman-Fried's trial, and the information Singh provided was instrumental in bringing charges against Salame, who pleaded guilty on September 7, 2023, and was sentenced on May 28, 2024.

### III. The Presentence Investigation Report and the Applicable Guidelines Range

The United States Probation Office issued a final Presentence Investigation Report on September 27, 2024. In the PSR, the Probation Office calculates the otherwise applicable Guidelines sentence to be life imprisonment, based on an offense level of 43 and a criminal history category of I. (PSR ¶ 101). Because this exceeds the statutorily authorized maximum sentence, the guideline term of imprisonment is 900 months. (*Id.*). The calculations of the Probation Office are set forth in paragraphs 51 through 66 of the Presentence Report. The offense level is driven principally by the loss amount of over $10 billion, which under U.S.S.G. § 2B1.1(b)(1)(P), results in a 30-level increase to the offense level. (PSR ¶ 56).

### IV. Singh's Cooperation and the Significance of his Assistance

Under Section 5K1.1 of the Guidelines, the appropriate reduction in a defendant's sentence for his cooperation is determined based on, among other things, "the significance and usefulness of the defendant's assistance," the "truthfulness, completeness, and reliability" of his information, the "nature and extent" of his cooperation, and the "timeliness of the defendant's assistance." As measured by those factors, Singh's cooperation was not only timely and significant, but exemplary.

#### *A. The Timeliness of Singh's Cooperation*

Singh's cooperation was very timely. On November 14, 2022, he directed his attorneys to reach out to the Government, and on November 18, his attorneys communicated information that Singh could provide at a meeting. On November 21, one week after FTX declared bankruptcy, Singh met with the Government and was debriefed over the course of two days. He was the fourth witness to meet with the Government, appearing a week after Wang and two lower-level employees, and before Ellison. Singh's interest in providing assistance was genuine from the outset. He came in voluntarily and his meeting with the Government was initiated by his counsel. Based on information known to the Government, Singh made his decision to cooperate and come in without knowledge that other individuals had begun proffering, and without any law enforcement action. Measured against almost any other white collar prosecution, the timeliness of Singh's cooperation was extraordinary.

The timeliness of Singh's assistance was not limited to meetings with the Government. Before he began meeting with the Government, Singh took steps to preserve Signal messages with Bankman-Fried and other coconspirators. That assistance was essential: the messages were set to auto-delete and would have been destroyed by the application by the time of Singh's first meeting with the Government had he not acted to preserve evidence when he did. The timeliness of Singh's preservation efforts ensured that the Government had access to Signal messages it would not have otherwise obtained (and indeed never did obtain from other sources) including Singh's one-on-one conversations with Bankman-Fried over Signal, and Singh's communications about making straw donations.

The timeliness of Singh's assistance contributed to the Government's ability to seek an indictment against Bankman-Fried. Indeed, Singh alerted the Government to Bankman-Fried's campaign finance offenses long before the Government would have otherwise discovered the

conduct from bank records or other witnesses. While it was not ultimately a charged offense at trial because the Bahamas did not consent to Bankman-Fried being tried for the offense, without Singh's early assistance the campaign finance charge would not have been part of the Indictment.

### B. The Nature, Extent, Usefulness and Significance of Singh's Cooperation

Singh's information and testimony were critical to bringing charges against Bankman-Fried and Salame, securing a conviction at trial against Bankman-Fried and a guilty plea from Salame, and tracing assets that have been forfeited as crime proceeds. Singh provided useful and significant cooperation in the following ways: (i) he provided testimony about and evidence of Bankman-Fried's involvement in the fraud on FTX's customers; (ii) he identified additional crimes that Bankman-Fried and Salame had participated in, and provided important documentary evidence not previously in the Government's possession; (iii) he assisted other governmental agencies and the bankruptcy estate; and (iv) he aided in the recovery of assets.

First, Singh provided significant assistance in the investigation of the collapse of FTX and the prosecution of Bankman-Fried. During his first interview with the Government, Singh described in detail FTX's computer code and the hidden special advantages that had been granted to Alameda Research. That information was important because it helped to reveal one of the ways in which Bankman-Fried misappropriated customers' money. More importantly, in recounting Bankman-Fried's involvement in directing those secret privileges in FTX's computer code, Singh established the falsity of Bankman-Fried's repeated claim that he barely knew how to code and did not know about Alameda Research's secret privileges. The only other person in a position to describe the code and Bankman-Fried's involvement in it was Gary Wang, whom Singh corroborated, demonstrating that Wang was not the chief architect of the hidden advantages for Alameda in FTX's code.

Singh also aided the Government significantly in determining how Bankman-Fried spent customers' money. As Singh's trial testimony made clear, he was intimately familiar with many of Bankman-Fried's large expenditures in 2022. Singh recounted Bankman-Fried's spending on real estate, celebrity endorsements, risky venture investments, speculative crypto investments, and other items. That included the Orchid penthouse, which Bankman-Fried wanted to purchase because he was a "fan of views" and "really liked" it (Trial Tr. at 1340), and an investment in K5, which Bankman-Fried fancied because it boosted his social standing with politicians and celebrities (Trial Tr. at 1328). While Singh often learned of large expenditures after the fact, he testified that he would "frequently go to Sam" and express his concerns. (Trial Tr. at 1312). That testimony was critical. It undermined Bankman-Fried's false claim that he had no motive to commit the charged crimes because he was an effective altruist. And it also undermined Bankman-Fried's false suggestion that he was not responsible for Alameda Research's spending. Singh put the lie to that narrative, testifying at length about how Bankman-Fried was unwilling to curb his oversized spending. As Singh described at trial, Singh took public and private stands against Bankman-Fried's excessive spending only to face "public humiliation" and anger from Bankman-Fried. (Trial Tr. at 1313). Singh's testimony went hand-in-hand with the expert testimony tracing Bankman-Fried's spending of FTX customer funds.

Singh did not just describe Bankman-Fried's spending, he produced and identified records demonstrating Bankman-Fried's spending. In some instances, Singh collected records and provided them to the Government before the Government had access to them. In other instances, Singh described important documents in his early proffer sessions, and then when he subsequently reviewed discovery materials, he identified those documents.

Most significantly, Singh testified in detail about his conversations with Bankman-Fried in September through November 2022. Consistent with the testimony of Ellison and Wang, Singh described Bankman-Fried's proposal in September 2022 that he shut down Alameda Research, and how that conversation made explicit the reality that Alameda Research had taken at least $13 billion from FTX customers. Recognizing the significance of that conversation, Singh produced the Google Doc that Bankman-Fried had created before he ever started proffering with the Government. And he made this disclosure in his very first meeting, even though he was implicating himself in the fraud on FTX customers in the process.

Perhaps the single most important piece of information provided by Singh was his telling of the conversation he had with Bankman-Fried on the balcony of the Orchid penthouse. Singh described the conversation in detail, consistently, in his meetings with the Government and at trial. In that meeting, Singh and Bankman-Fried discussed explicitly how that was "13 billion borrowed and we can't pay it all," how Bankman-Fried had been aware of that fact for some time, and how it was important that they curtail spending. The implication of that conversation, which was featured in the Government's summations, was that Bankman-Fried was aware of the fraud and knew what he was doing was wrong. The testimony was important to rebut one of Bankman-Fried's defenses: that he was unaware of the fraud, did not know what position they were in financially, and only learned about Alameda Research's finances in the final days of FTX. Thus, Singh's testimony not only established Bankman-Fried's knowing commission of the fraud, but it corroborated the testimony of Wang and Ellison about Bankman-Fried's involvement. Such corroboration was crucial given that Bankman-Fried had taken pains throughout the conspiracy to avoid a paper trail and to delegate actions to Ellison, who authored many of the most incriminating documents at Bankman-Fried's direction. Absent Singh's testimony, Bankman-Fried's effort to falsely implicate Ellison as the sole decisionmaker and to impugn her credibility might have gained more traction. But Ellison's testimony, coupled with Singh's corroboration, provided proof beyond any reasonable doubt that Bankman-Fried had criminal knowledge and intent, and was the architect of the scheme.

Singh also provided significant testimony concerning Bankman-Fried's tweets in November 2022. In early November, Bankman-Fried was focused on convincing customers not to withdraw their money and was proposing "strong" tweets to curb the withdrawals. (Trial Tr. at 1464). As he testified, Singh believed tweets characterizing FTX as "solvent" or "well capitalized" were false and misleading, and expressed as much to Bankman-Fried. (*Id.*). Bankman-Fried then posted a series of false tweets. Singh's description of this moment at trial was important not only because it established that Bankman-Fried's tweets were false; his testimony also proved that Bankman-Fried knew his tweets were false and deceptive before they were made. Like his other testimony, Singh's information rebutted one of Bankman-Fried's trial defenses, that he did not know his tweets were false, and did not intend to mislead when he tweeted.

Second, Singh provided significant assistance by identifying criminal activity by Bankman-Fried and Salame, which would have otherwise taken a substantial amount of time to discover—indeed, some of it may never have been discovered. At Bankman-Fried's sentencing, the Court observed that Bankman-Fried "set up a vehicle for making political donations … through straws that wouldn't come back to him" and in the process perpetrated one of "the biggest political financial crimes in history." (Bankman-Fried Sent. Tr. at 50). Singh is singularly responsible for bringing that crime to the Government's attention. During his initial two-day meeting with the Government, Singh identified this conduct. At the time, the Government was entirely unaware of this criminal conduct and was not conducting any investigation that would have surfaced this illegal donation scheme. Because the straw donations were made in relatively low-dollar amounts, where transferred across multiple accounts, were communicated about over Signal, and were described as "loans" in Alameda Research's books, it is plausible that the Government may never have discovered or been in a position to prove Bankman-Fried's involvement in these campaign finance violations. In fact, in addition to Singh's testimony, most of the Government's evidence of campaign finance violations came in the form of Signal messages that had been screenshotted by Singh. Had Singh not preserved and produced those records, the Government would have never gotten access to them. Moreover, without Singh's information and cooperation, Salame never would have been prosecuted for campaign finance offenses. In short, Singh deserves enormous credit for bringing this criminal conduct to the Government's attention, even though it meant implicating himself in the process. Bankman-Fried's campaign finance violations would have, alone, been a historic case, and Singh's assistance in the investigation and prosecutions for those crimes cannot be overstated.

Although the Government could not proceed at Bankman-Fried's trial on the campaign finance charge, because the Bahamas did not consent to Bankman-Fried being tried for the offense (as is required by law for an extradited defendant), the evidence was still an important piece of the trial proof. The evidence established one of the forms in which Bankman-Fried laundered funds from Alameda Research. The acts of concealment entailed in the campaign finance scheme was evidence of Bankman-Fried's intent in connection with the fraud on customers. And the fact that Bankman-Fried was the person to benefit from the political donations aided in establishing that it was Bankman-Fried, not Ellison, who directed Alameda Research's spending of funds.

Singh is singularly responsible for identifying certain fraudulent actions Bankman-Fried took with respect to FTX's investors and auditor. As described above, Singh brought to the Government's attention the backdated Serum transaction that Bankman-Fried orchestrated. Like the campaign finance violations, the Government was unaware of that criminal conduct, and was unlikely to have discovered it without Singh's assistance. The same goes for other deceptive acts that Bankman-Fried instructed Singh to take with respect to FTX's auditors.

Third, as confirmed by SEC and CFTC, Singh also provided valuable assistance to the SEC and CFTC in their parallel investigations for similar reasons. From his first proffer, Singh answered questions in a room filled with law enforcement agents, Assistant U.S. Attorneys, and representatives from the SEC and CFTC who were conducting their own parallel investigations. Based on conversations with the SEC and our review of the SEC's civil complaints, we understand that the SEC's civil complaints relied in part on information provided by Singh or corroborated by

him. In addition to the SEC's interest in the fraud on FTX investors, Singh provided the SEC with detailed information about FTX's auditor.

With respect to the CFTC, Singh provided substantial assistance to the CFTC in its civil enforcement actions against Bankman-Fried and the FTX and Alameda Research entities, as well as in related matters involving possible violations of the Commodity Exchange Act. Singh entered into a written cooperation agreement with the CFTC's Division of Enforcement on January 20, 2023, and on February 28, 2023, Singh entered into a Consent Order of Judgement on Liability as to the CFTC's civil charges against him. *See CFTC v. Singh*, No. 23-cv-1684 (S.D.N.Y.), ECF No. 17. In that order, Mr. Singh admitted that he engaged in the charged conduct and accepted responsibility for his actions. Both before and after the date of Singh's cooperation agreement with the CFTC, he provided material assistance in connection with the CFTC's action against FTX, Alameda Research, and Bankman-Fried. The CFTC's action against the FTX and Alameda Research entities resulted in a $12.7 billion consent judgment, with all monetary relief to be used to compensate to FTX customers and victims of FTX's fraud. *See* Consent Order For Permanent Injunction and Other Equitable Relief Against Defendants FTX Trading Ltd. d/b/a FTX.com and Alameda Research, LCC, *CFTC v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y. Aug. 7, 2024), ECF No. 44. The CFTC's action against Bankman-Fried continues, and Singh has agreed to continue providing information to the CFTC, and to testify in that action, as needed.

Singh also cooperated with three investigations being conducted by state authorities. He participated in interviews with two state investigatory authorities to assist them in their investigations, and produced documents to a third state authority. Singh has reached a settlement with the civil MDL plaintiffs, participated in an interview with them, helped the FTX debtors as part of the bankruptcy, will soon be interviewed by the estate, and met with the bankruptcy court Examiner as part of its inquiry.

Singh also assisted the Department of Justice's National Cryptocurrency Enforcement Team and the United States Attorney's Office for the District of Columbia in connection with a separate investigation concerning the hack of FTX by answering questions about, among other things, how FTX held assets and its security protocols.

Finally, Singh has provided substantial assistance in the recovery of victims' money. While working at FTX, Singh agreed to forgo cash bonuses, and around the time of FTX's bankruptcy he did not seek to withdraw or sell any of his assets. Rather, Singh preserved his assets to be forfeited, and consented to their forfeiture. He has agreed, among other things, to the forfeiture of his shares of an artificial intelligence company, now valued at millions more than what he purchased them at. He has also agreed to forfeit the home in the San Juan Islands that he purchased. And he has agreed to forfeit funds to the Government reflecting earnings when he was employed at FTX.

### C. Singh's Truthfulness and Reliability

Singh's testimony was truthful and was corroborated by other evidence. From his first meeting, Singh took responsibility for his involvement in the fraud on FTX's customers. While he certainly became involved later than some other participants, and did not have a leading role in the

fraud, Singh nonetheless took responsibility for his conduct, was prepared to plead guilty, and did plead guilty for his involvement in those crimes.

What is particularly notable about Singh is that of the crimes that he pleaded guilty to, it was only the fraud on FTX's customers that the Government was aware of prior to Singh proffering with the Government. He brought to the Government's attention the conduct that was the basis for his plea to conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to commit campaign finance violations. The Government debriefed Singh over a series of proffer sessions about his involvement in the straw donor scheme and his understanding of the campaign finance rules. While Singh could have entirely shirked responsibility by claiming that he did not believe he was doing anything wrong, he instead was careful in explaining his understanding: he admitted in his guilty plea that he knew what he was doing was wrong and had consciously avoided confirming the conduct's illegality.

Singh was fully committed to cooperation. He made seven cross-country trips to New York. He met with prosecutors and regulators on at least 25 occasions often for many hours. His disclosures were complete. He brought information and evidence to the Government's attention, and the information uncovered by the Government in its own investigation corroborated things that Singh disclosed previously.

### V.  Restitution and Remission

At Bankman-Fried's sentencing, the Court declined to order restitution "due to the complexity of the case and the number of victims," and instead granted the Government's motion to authorize the United States to compensate victims with finally forfeited assets through a remission process. (Dkt. 424 at 6). The Court ordered the same at Ellison's sentencing. The Court should do the same here. As explained in the Government's submission ahead of Bankman-Fried's sentencing, ordering restitution would be extremely costly and administratively impractical in this case. *See* Dkt. 410 at 109-112. Therefore, the Government seeks to return all stolen assets to victims through a remission process, consistent with its frequent approach in complex fraud cases with numerous victims. *See id.* at 110 (citing *United States v. Madoff*, 09 Cr. 213 (DC), Dkt. 106 & *United States v. Bonventre*, 10 Cr. 228, Dkt. 318 (Madoff Ponzi scheme); *United States v. Sharma*, 18 Cr. 340, Dkt. 407 (multi-million dollar cryptocurrency scheme); *United States v. Dos Santos*, 20 Cr. 398, Dkt. 283 (multi-million dollar cryptocurrency scheme)).

Accordingly, the Government respectfully requests that the Court include the following language regarding restitution in its sentence and judgment:

> The Court declines to order restitution, based on its finding that determining complex issues of fact related to the cause and amount of the victim's losses would complicate and prolong the sentencing process. It instead grants the government's motion to authorize the United States to compensate victims with finally forfeited assets through a remission process, as restitution would be impractical in this case.

## VI. Conclusion

The Government believes that Singh provided substantial assistance to the Government in its investigation and prosecution of wrongdoers, and in its recovery of assets for victims. Accordingly, as discussed, assuming Singh continues to comply with the terms of his cooperation agreement, the Government intends to request at sentencing that the Court sentence Singh in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    /s/ Nicolas Roos
Danielle R. Sassoon
Danielle Kudla
Thane Rehn
Nicolas Roos
Assistant United States Attorneys
Southern District of New York

cc: Andrew D. Goldstein, Esq. (by ECF)
    Russell Capone, Esq.
    Anupam Dhillon, Esq.